```
                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF KENTUCKY
                      PADUCAH DIVISION

         CIVIL ACTION NO. 5:21-cv-00134-GNS-LLK



  JARED THOMAS KENNEDY                            PLAINTIFF




  v.



  AARON ACREE
  GARY HICKS
  MICAH KAMINSKI                                  DEFENDANTS




  DEPONENT:   GARY HICKS

  DATE:       MAY 7, 2024


  REPORTER:   STEVEN TAYLOR
```

TAYLOR COURT REPORTING KENTUCKY
2901 SIX MILE LANE
LOUISVILLE, KENTUCKY 40220

Taylor Court Reporting Kentucky
(502) 671-8110  Fax (502) 671-8116

EXHIBIT C

Gary Hicks
May 7, 2024

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15          GARY HICKS
16          MAY 7, 2024
17
18
19
20
21
22
23
24
25

```
 1
 2                     APPEARANCES
 3
 4   COUNSEL FOR PLAINTIFF:
 5
 6   Marilyn Linsey Shrewsbury, Esq.
 7   (Appeared via Zoom videoconference)
 8   MARILYN SHREWSBURY, ESQ
 9   256 Commerce Street
10   PO Box 1226
11   Eddyville, Kentucky 42038
12   Telephone:  (502) 303-5228
13   Email:  linsey@mlslawgroup.com
14
15   COUNSEL FOR DEFENDANT GARY HICKS:
16
17   Stacey A. Blankenship, Esq.
18   (Appeared via Zoom videoconference)
19   KEULER, KELLY, HUTCHINS, BLANKENSHIP, & SIGLER,
20   LLP
21   100 South 4th Street
22   Suite 400
23   Paducah, Kentucky 42001
24   Telephone:  (270) 448-8888
25   Email:  sblanksenship@kkhblaw.com
```

```
 1
 2                    APPEARANCES
 3
 4   COUNSEL FOR DEFENDANT AARON ACREE:
 5
 6   Derrick T. Wright, Esq.
 7   (Appeared via Zoom videoconference)
 8   STURGILL, TURNER, BARKER & MALONEY, PLLC
 9   333 West Vine Street
10   Suite 1500
11   Lexington, Kentucky 40507
12   Telephone:  (859) 255-8581
13   Email:  dwright@sturgillturner.com
14
15   COUNSEL FOR DEFENDANT MICAH KAMINSKI:
16
17   Thomas N. Kerrick, Esq.
18   Colton W. Givens, Esq.
19   (Both appeared via Zoom videoconference)
20   KERRICK BACHERT PSC
21   1025 State Street
22   Bowling Green, Kentucky 42101
23   Telephone:  (270) 782-8160
24   Email:  tkerrick@kerricklaw.com
25           cgivens@kerricklaw.com
```

```
 1        A.      Yes, ma'am.  That's an annual.
 2        Q.      So your in-service varies year to
 3   year.  That's annual.
 4                Is that fair to say?
 5        A.      Yes.
 6        Q.      And then you annually retrain with
 7   firearms.
 8                Is that fair to say?
 9        A.      Yes.
10        Q.      Do you have any other trainings
11   that you have to undergo annually?
12        A.      Taser training.
13        Q.      Excuse me.  Tell me what you recall
14   about the incident that we're here today to
15   discuss.  That would be the Jared Kennedy
16   incident.
17        A.      What specifically do you want me to
18   talk about on it?
19        Q.      Anything that you recall from that
20   arrest and after the arrest.
21        A.      I recall Kaminski calling out that
22   he had a vehicle not stopping for him.  That he
23   had tried to stop on Main Street.  That it had
24   driven through several yards, ditches, struck a
25   tree, and was refusing to stop.
```

```
 1              I then remember him calling out
 2   that he was on Lakota heading to the bypass.  At
 3   that time, I had caught up to him on the bypass
 4   just west of Lakota, so just past Lakota, and I
 5   took over primary on it as we were going out
 6   into the county.
 7              As I got behind the car, the car
 8   had no license plate.  The car had no rear
 9   bumper.  The car had a flat tire, and he was
10   swerving all throughout his lane.  I had all my
11   emergency equipment on, my lights, my sirens,
12   and Kaminski continued behind me at that time.
13              He continued to fail to stop for
14   approximately eight miles, which was, you know,
15   I'd say roughly 15 minutes of him driving.
16   Going through multiple turns and roadway
17   changes.  Once we got to the intersection of
18   Rockcastle Road and Little River Boulevard I was
19   given authority by the sheriff at that time, who
20   had joined the pursuit, to conduct a PIT
21   maneuver.
22              At that time, it was the safest
23   position and speed for me to conduct that PIT
24   maneuver in.  He was driving extremely slow
25   turning onto Little River Boulevard, making the
```

```
 1   turn.  So as he had slowed down, I conducted the
 2   PIT maneuver.
 3              I recall the PIT maneuver was
 4   successful.  It stalled his vehicle out.  And as
 5   I got out of my vehicle to start giving commands
 6   and make my approach to that car, he started the
 7   car again and continued to drive off again.
 8              We then got back in our car and
 9   continued the pursuit again onto Little River
10   Boulevard.  At that time, it ended in a driveway
11   at which time he refused to get out of the car.
12   He was pulled from the vehicle.  He had resisted
13   coming out of the car, had to be physically
14   pulled from the car.
15              Once on the -- once I had pulled
16   him from the vehicle, he kept his arms and
17   elbows almost braced like a plank, as if he was
18   pushing up off the ground.  Would not get
19   completely flat on the ground.
20              I couldn't access his -- his hands.
21   At that time, I was able to roll him flat out,
22   at which time I was trying to pull his hands out
23   from under him, but he was not giving me his
24   hands.  I didn't know if he was armed, if he was
25   trying to access weapons.
```

```
 1        A.    I don't recall what the exchange of
 2   his words were at that time, no.
 3              (Reporter's Note:  Whereupon a
 4   video was played.)
 5   BY MS. SHREWSBURY:
 6        Q.    Did you hear Mr. Kennedy saying
 7   that he wasn't pulling when you asked him to
 8   stop pulling?
 9        A.    He did say that.
10        Q.    And I know this video footage is
11   really bad, but do you recall whether or not, at
12   any point in time when Mr. Kennedy was on the
13   ground, whether or not he was kicking or his
14   arms were flailing or he was attempting to hit
15   you or Sheriff Acree?
16        A.    As I stated before, he was
17   attempting to push up off the ground.  And then
18   once I was able to get him flat on his stomach,
19   he then would not give us his hands.  So I did
20   not know if he was trying to access weapons and
21   so forth.  He was not actively trying to strike
22   me as I was controlling his hands or attempting
23   to control his hands.
24        Q.    And other -- again, other than you
25   telling him to get out of his vehicle and the
```

```
1          A.    Because he has already showed the
2    non-compliance in the fleeing and evading.  I
3    don't know who he is.  I don't know where he's
4    at.  He just pulled into a random house.  He's
5    already fled from several officers.
6                He had a PIT con -- a PIT maneuver
7    conducted on him.  He fled again.  And in my
8    experience, somebody that is trying that hard to
9    get away from law enforcement is very dangerous
10   and can be very violent to us.
11               And then they pull up into a
12   driveway, a very dark driveway.  Into somebody's
13   home.  I don't know what they're trying to do.
14   I don't know if they're trying to get to that
15   house.  I don't know if they're trying to access
16   a weapon.  So it was imperative at that time for
17   me to make contact with him quickly and get him
18   under control quickly before anybody was hurt.
19         Q.    And is that something that you
20   learned in training?
21         A.    Yes.  Training and experience
22   throughout the years that I've done this.
23         Q.    Well, I asked you earlier how often
24   you would have to pull somebody out of their
25   car.  Do you recall me asking you that?
```