```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF KENTUCKY
 2                      PADUCAH DIVISION

 3        CIVIL ACTION NO. 5:21-cv-00134-GNS-LLK

 4

 5   JARED THOMAS KENNEDY                        PLAINTIFF

 6

 7

 8   v.

 9

10

     AARON ACREE
11   GARY HICKS
     MICAH KAMINSKI                             DEFENDANTS
12

13

14

15   DEPONENT:  AARON ACREE

16   DATE:      NOVEMBER 20, 2024

17

18   REPORTER:  STEVEN TAYLOR

19

20

21

22

23

24         TAYLOR COURT REPORTING KENTUCKY
                 2901 SIX MILE LANE
25         LOUISVILLE, KENTUCKY 40220
```

```
                   AARON ACREE

                NOVEMBER 20, 2024
```

```
 1
 2                    APPEARANCES
 3
 4   COUNSEL FOR PLAINTIFF:
 5
 6   Marilyn Linsey Shrewsbury, Esq.
 7   (Appeared via Zoom videoconference)
 8   MARILYN SHREWSBURY, ESQ.
 9   256 Commerce Street
10   PO Box 1226
11   Eddyville, Kentucky 42038
12   Telephone:  (502) 303-5228
13   Email:  linsey@mlslawgroup.com
14
15
16   COUNSEL FOR DEFENDANT, AARON ACREE:
17
18   Derrick T. Wright, Esq.
19   (Appeared via Zoom videoconference)
20   STURGILL, TURNER, BARKER & MALONEY, PLLC
21   333 West Vine Street
22   Suite 1500
23   Lexington, Kentucky 40507
24   Telephone:  (859) 255-8581
25   Email:  dwright@sturgillturner.com
```

```
 1
 2                       APPEARANCES
 3
 4   COUNSEL FOR DEFENDANT, GARY HICKS:
 5
 6   James P. Landry, Esq.
 7    (Appeared via Zoom videoconference)
 8   KEULER, KELLY, HUTCHINS, BLANKENSHIP, & SIGLER,
 9   LLP
10   100 South 4th Street
11   Suite 400
12   Paducah, Kentucky 42001
13   Telephone:  (270) 448-8888
14   Email:  jlandry@kkhblaw.com
15
16
17   COUNSEL FOR DEFENDANT, MICAH KAMINSKI:
18
19   Matthew P. Cook, Esq.
20    (Appeared via Zoom videoconference)
21   KERRICK BACHERT PSC
22   1025 State Street
23   Bowling Green, Kentucky 42101
24   Telephone:  (270) 782-8160
25   Email:  mcook@kerricklaw.com
```

1               Correct?
2       A.      Yes, he was.
3       Q.      Same type, Chevy Tahoe, or a
4   different type?
5       A.      Yes.  Yeah, he was in Chevy Tahoe
6   also.
7       Q.      Did his have dash cam capabilities,
8   if you know?
9       A.      No.  I don't think any of our
10  vehicles had dash cam at all.  No, they didn't.
11      Q.      And so once you got involved, you
12  said that you authorized legal intervention.
13  What does that mean, and what -- how did that
14  come about?
15      A.      The PIT maneuver to disable the
16  vehicle.
17      Q.      And what's a PIT maneuver?
18      A.      It's when you -- while you're
19  operating your car, as long as the environment
20  is safe at the time, as safe as it can be
21  outside of the pursuit already.
22              It's when you take the front end of
23  your vehicle, and best you can, position it in a
24  way at the tail end of the fleeing suspects
25  vehicle.  You accelerate and turn into their

Aaron Acree
November 20, 2024

126

1   vehicle, and it should be a very smooth process
2   to disable their vehicle.
3              It should cause them to spin out
4   and be disengaged from the pursuit.
5       Q.    And who carried out the PIT
6   maneuver?
7       A.    Deputy Gary Hicks.
8       Q.    In your recollection, you said that
9   initially, it was effective, but then he was
10  able to restart the vehicle.  And by, he, I
11  assume you were talking about Kennedy.
12      A.    It was very quick.  Yes, ma'am.  It
13  was very quick.
14      Q.    What kind of vehicle was
15  Mr. Kennedy driving, if you recall?
16      A.    I don't recall what kind of vehicle
17  he was in.
18      Q.    Do you recall if it was, like, a
19  truck, an SUV, a four-door, two-door?
20      A.    I know it was a small car, but I
21  don't know make, model.
22      Q.    Do you recall what color the
23  vehicle was?
24      A.    It was a dark colored car, maybe.
25      Q.    There has been testimony from

```
 1        Q.      And you used your baton.
 2                Do you recall that?
 3        A.      I do.  Yes, ma'am.
 4        Q.      So tell me your thought process.
 5   Why did you use your baton?
 6        A.      He was resisting arrest.
 7        Q.      And what were the indicators?
 8        A.      He was not complying with verbal
 9   commands.
10        Q.      And what verbal commands was he not
11   complying with?
12        A.      He was not complying with showing
13   -- showing his hands and stop resisting.  I
14   distinctly remember him not -- not giving his
15   hands up.
16                And it looked as if -- no, it
17   didn't it look, it was that he was trying to
18   either get up or roll over.  And I -- the only
19   thing that I could think of at the time was to
20   neutralize his mobility and -- and -- using my
21   baton.
22        Q.      Did you see any weapons on him?
23        A.      Any weapons?
24        Q.      Yeah.  Did he look like he was
25   reaching in his pockets for things?  I mean,
```

1  you're saying you -- he was rolling --
2      A.    Yeah, that's -- that's what I
3  perceived.  Because he was -- I mean, if you're
4  laying face down on your chest and you're
5  rolling and you're refusing to put your hands
6  out, I don't know what he's -- I don't know what
7  he's reaching for in his waistband, or his
8  pockets.  I don't know what -- what he had had.
9      Q.    But you didn't see anything.
10           Right?
11     A.    At that time, no.
12     Q.    And were you positioned at the
13 bottom of Mr. -- on the lower half of
14 Mr. Kennedy, or the upper half of his body?
15     A.    The lower extremities, I believe.
16     Q.    And Officer Hicks, he had the upper
17 extremities?
18     A.    Yes, ma'am.
19     Q.    And did you see Officer Hicks use
20 -- do -- did -- do you know if Officer Hicks had
21 a baton at that time?
22     A.    He did not.  He had a baton issued,
23 but he was not -- he -- he was not using a
24 baton.
25     Q.    Okay.  So he had a baton, but he

1   wasn't using a baton.  What was he using, if
2   anything?
3        A.   I think he was using closed --
4   closed hand.  Closed hand at that point in time
5   --
6        Q.   So his hands?
7        A.   -- when we were trying to effect --
8   yes.  He -- yeah, he -- he was using his hands.
9   No, he did not have any tools that he was using.
10  I'm sorry.
11       Q.   What made you think you needed to
12  use the baton rather than your hands?
13       A.   Because Deputy Hicks' hands weren't
14  -- that -- that part of the arrest wasn't being
15  effective.  So there's -- as I -- as I stated
16  before, a level of force continues.
17            I -- I use a tool and try to
18  neutralize his mobility, because Deputy Hicks'
19  tactic and techniques were obviously not working
20  to effect the arrest.
21       Q.   Were you out of the car when Deputy
22  Hicks issued his first verbal command to
23  Mr. Kennedy?  Did you hear it?
24       A.   His first verbal commands?  I don't
25  recall.  I don't recall if I was.  There was a

```
 1   the road while you were involved?
 2        A.    It was -- it was dark.  I'm sure I
 3   passed vehicles on the way, responding.  I know
 4   I did.
 5        Q.    How many?
 6        A.    I don't -- I -- I don't know.  I
 7   didn't count.
 8        Q.    Did Officer Hicks ask you if you
 9   passed vehicles while you were responding?
10        A.    I don't have any recollection of
11   that, if he asked me.
12        Q.    He then goes on to say, Once
13   stopped, the suspect refused to get out of the
14   vehicle and had to be forced to the ground.
15              Is that what you recall?
16        A.    Yes.  That's what he's got wrote.
17        Q.    No, I'm asking if that's what you
18   recall.
19        A.    Yes.
20        Q.    The suspect ignored numerous
21   commands to stop resisting and continuously
22   tried to get back on his feet.
23              Is that what you recall?
24        A.    Yes.
25        Q.    What made you think he was trying
```

Aaron Acree
November 20, 2024

193

```
1    to get back on his feet?
2         A.    Because he was not maintaining the
3    position of staying on the ground.
4         Q.    And again, you know, you didn't
5    know whether or not there was a physical reason
6    for that.
7               Right?
8         A.    Correct.
9         Q.    Why -- why he --
10        A.    He didn't tell -- he -- he didn't
11   tell me.
12        Q.    The position that he was on the
13   ground in, I mean.  But at -- at what point was
14   he -- was he ever able to get on his feet?  I
15   mean, how does -- how you -- how do you think --
16   what constitutes trying to get on your feet?
17   What movements did he make --
18        A.    When you're not complying.
19              MR. WRIGHT:  Object to form.
20              Go ahead.
21   BY MS. SHREWSBURY:
22        Q.    What movement -- yeah, what -- what
23   movement --
24        A.    When he's not -- when he's not
25   complying.  When he's rolling on his side or
```

1  was -- he was traveling and a PIT maneuver was
2  -- was utilized.
3      Q.   Does it matter how fast somebody's
4  going for a PIT maneuver to be successful?
5      A.   Yes, ma'am.  Yes.  Yeah.
6      Q.   So how fast can somebody go for a
7  PIT maneuver to be successful?
8      A.   I don't remember the specific
9  amount, but speeds -- excessive speeds, you --
10 you don't use a PIT maneuver.  It's just not
11 safe.
12     Q.   Okay. Myself and Sheriff -- well,
13 he goes, The technique was successful in safely
14 ending the pursuit momentarily.  Which you've
15 testified about already.
16          He then goes on and says, Myself
17 and Sheriff Acree began giving Kennedy commands,
18 however, he ignored them, started his vehicle,
19 and drove off.
20          Did you issue him commands?
21     A.   I remember -- I remember being on
22 the PA system, maybe.  I think that's what that
23 -- I remember hearing Deputy Hicks on the PA,
24 and I got on the PA.  It's where you can talk
25 through the speaker through the car.

1    Q.    So you were issuing him commands at
2    that time?
3    A.    I think I remember grabbing the --
4    the PA -- I think I remember grabbing that PA
5    system.
6    Q.    However, he ignored them, started
7    his vehicle, and drove off.  Kennedy's actions
8    were becoming more dangerous as his willingness
9    to do anything to get away seems to increase.
10         Do you see that?
11   A.    Yes, I see it.
12   Q.    It goes on to say, Kennedy finally
13   stopped in a driveway, but then refused to get
14   out of the vehicle.  I opened his door and had
15   to force Kennedy to the ground, at which time he
16   was actively pulling away and pushing off the
17   ground to try and regain his footing and
18   tactical advantage.
19         Do you see that?
20   A.    I do.
21   Q.    You've already testified that you
22   also believed that Kennedy was trying to regain
23   his footing.
24         Right?
25   A.    I don't know -- that's what I

```
 1        Q.     I guess, in your experience, do a
 2   suspect's words and actions always align?
 3        A.     No.  No.  Absolutely not.
 4        Q.     I'm guessing you've had occasions
 5   -- I'm sorry.
 6        A.     Yeah, I was going to say, we're
 7   deceived all the time.
 8        Q.     I was going to say that.  I guess
 9   you've had occasions where a suspect says
10   they're going to do something, but then do the
11   exact opposite of what they say?
12        A.     Yeah.  As I testified earlier, the
13   suspect that I -- where I gave the example of
14   the pursuit.  I mean, I was anticipating writing
15   him a citation.  I -- he even gave me his
16   driver's license.  I had no anticipation on him
17   fleeing like he did.
18        Q.     As you could -- would you consider
19   an unknown suspect who had led police on a
20   pursuit in the dark, and continued after PIT
21   maneuvers, to be a physical threat to deputies
22   and yourself?
23        A.     It would be perceived that way,
24   yes.
25        Q.     And let's talk about what you were
```