```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF KENTUCKY
 2                      PADUCAH DIVISION

 3         CIVIL ACTION NO. 5:21-cv-00134-GNS-LLK

 4

 5    JARED THOMAS KENNEDY                         PLAINTIFF

 6

 7
      v.
 8

 9

10    AARON ACREE
      GARY HICKS
      MICAH KAMINSKI                              DEFENDANTS
11

12

13

14

15    DEPONENT:   WILLIAM ALEXANDER PAYNE

16    DATE:      JUNE 11, 2025

17

18    REPORTER:  JESSIE TAYLOR ROSS

19

20

21

22

23

24            TAYLOR COURT REPORTING KENTUCKY
                    2901 SIX MILE LANE
25             LOUISVILLE, KENTUCKY 40220
```

2

WILLIAM ALEXANDER PAYNE

JUNE 11, 2025

```
 1
 2                    APPEARANCES
 3
 4   COUNSEL FOR PLAINTIFF:
 5
 6   Annie Malka, Esq.
 7   (Appeared via Zoom videoconference)
 8   MALKA LAW OFFICE
 9   1387 South Fourth Street
10   Louisville, Kentucky 40208
11   Telephone:  (502) 212-5888
12   Email:  annie@malkalawgroup.com
13
14
15   COUNSEL FOR DEFENDANT, AARON ACREE:
16
17   L. Scott Miller, Esq.
18   (Appeared via Zoom videoconference)
19   L.S. MILLER LAW, PLLC
20   333 West Vine Street
21   Suite 1720
22   Lexington, Kentucky 40507
23   Telephone:  (859) 456-2244
24   Email:  lsmiller@lsmlaw.com
25
```

Case 5:21-cv-00134-GNS-LLK   Document 81-7   Filed 10/03/25   Page 4 of 11 PageID #: 1214
William Alexander Payne
June 11, 2025

4

```
 1
 2                    APPEARANCES
 3
 4   COUNSEL FOR DEFENDANT, GARY HICKS:
 5
 6   Stacey A. Blankenship, Esq.
 7   (Appeared via Zoom videoconference)
 8   KEULER, KELLY, HUTCHINS, BLANKENSHIP, & SIGLER,
 9   LLP
10   100 South 4th Street
11   Suite 400
12   Paducah, Kentucky 42001
13   Telephone:  (270) 448-8888
14   Email:  sblankenship@kkhblaw.com
15
16
17   COUNSEL FOR DEFENDANT, MICAH KAMINSKI:
18
19   Matthew P. Cook, Esq.
20   (Appeared via Zoom videoconference)
21   KERRICK BACHERT PSC
22   1025 State Street
23   Bowling Green, Kentucky 42101
24   Telephone:  (270) 782-8160
25   Email:  mcook@kerricklaw.com
```

79

```
 1   discussed, are these things that should be kind
 2   of looked at together as part of a whole, or
 3   would any one of these variables justify use of
 4   force?
 5        A.    It's not necessarily --
 6              MR. MILLER:  Object to form.
 7              THE WITNESS:  Oh, okay.
 8              MR. MILLER:  Go ahead.  You can
 9   answer if you can.
10        A.    It -- it's not necessarily -- what
11   I refer to them is, it's a factor.  It's not
12   necessarily a justification.
13   BY MS. MALKA:
14        Q.    Okay.  As a factor.  So for
15   example, severity of crime alone would not be
16   sufficient to say that use of force was
17   reasonable -- objectively reasonable.
18              Is that fair, there would need to
19   be more considered, besides just that single
20   factor?
21        A.    Yes.  You know, because you -- you
22   know, if we're just sitting here and you're
23   talking, you just say -- you just say severity
24   of the crime, okay?  And then somebody comes
25   back and well -- and says, it's a, you know,
```

1    it's a felony.  Well, you think, oh, okay, well,
2    you know, that might justify that.
3                 Well, no, you -- you know, you got
4    to look -- there's felonies out there.  You can
5    have somebody who, like for example, didn't pay
6    their child support or something.  That's not
7    necessarily -- it has no violence attached to
8    it.  So I think you've got to go deeper, as far
9    as just the severity of the crime.
10                But if that severity -- and that's
11   one of those things, if that includes violence
12   or the potential for violence, the potential for
13   injury, there you start to get into what I've
14   referred to as -- you know, that's -- that's
15   severity that will influence use-of-force
16   decision making.
17        Q.     Would you characterize the pursuit
18   of Mr. Kennedy as a low-speed pursuit?
19        A.     At times, it appeared to be, you
20   know.  And then at times it was fairly quick,
21   you know, for -- you know, or fast for the
22   environment.
23        Q.     At what times was it fast?
24        A.     Well, like through the parking
25   lots, for example.  You know, when he was -- the

1    Q.    And would you agree that based on
2    the video, no one asks Mr. Kennedy --
3    Mr. Kennedy to exit the vehicle before opening
4    the door?
5    A.    I -- yeah, I -- this time, I don't
6    see -- see anything that would indicate they
7    did.
8    Q.    Do you believe there should have
9    been a verbal command for Mr. Kennedy to exit
10   the vehicle at this point, when he was in the
11   driveway?
12              MS. BLANKENSHIP:  Objection to
13   form.
14              THE WITNESS:  Can I -- can I
15   answer?
16   BY MS. MALKA:
17   Q.    You can answer if you know.
18   A.    Okay.  You know, there's -- there's
19   two ways to go about the situation, and these
20   officers committed to one of them, which they
21   committed to all the way in.  And so if we're
22   going to commit to all the way in, that means
23   everybody up there by the car, we've got to get
24   him out.  Then we're going to do that as quickly
25   as we can.

1                Now, why would they commit to all
2     the way in?  Because it appears to me, from what
3     I've read and reviewed, that he was given the
4     opportunity to stop and exit his vehicle once
5     prior to this, and he chose to take back off,
6     which started the pursuit back up.
7                We also, I believe, have to keep in
8     mind that he could have really stopped at any
9     time, you know, out on the road, any place prior
10    to this driveway and simply stuck his hands out
11    the window, open the door, give up, put your
12    hands where the officers can see him and obey
13    verbal commands.  And we probably wouldn't be
14    here.  But he chose not to do that.
15               And so these --
16         Q.    Are you --
17         A.    -- basically these officers are
18    taking the decision-making process away from
19    him.
20         Q.    So you mentioned that there's two
21    ways it can go.
22         A.    Uh-huh.  (Witness answers in the
23    affirmative.)
24         Q.    This is one way, right, the way
25    that it played out.

```
 1                Fair?
 2        A.      Right.
 3        Q.      What's the other way?
 4        A.      Well, the other way is the way they
 5   tried, and it wasn't successful, and that's all
 6   the way out.  We don't approach.  We lay back,
 7   we give them verbal commands, we yell at them,
 8   we walk them back to us.
 9                A lot of times that's commonly
10   known as a felony stop, and -- and there are
11   certain tactics that come into play there, where
12   if you have a compliant driver and they're
13   listening to you, then you follow the officer's
14   instructions, and basically, the suspect then
15   walks back, hands visible, to the officers.
16   They put them down in a kneeling position, and
17   they're cuffed quickly, easily, efficiently, and
18   that's the end of it.  That's usually how that
19   goes.  That's the, all the way out.
20                But they tried that, that wasn't
21   successful, so it looks like they were going to
22   try all the way in.
23        Q.      And you would agree, though, that
24   the first time they asked him to exit the
25   vehicle was in the middle of a public roadway.
```

```
 1         Q.    All right.
 2         A.    Because I don't -- I don't believe
 3   -- unless somebody can tell me different, that
 4   we -- the entirety of this pursuit was captured,
 5   you know, on bodycam.  So just -- I'm just going
 6   by what I saw.
 7               MS. BLANKENSHIP:  Okay.  That's all
 8   I had.  Thank you.
 9               THE WITNESS:  Yes, ma'am.
10               MR. MILLER:  Matt, do you have
11   anything?
12               MR. COOK:  Not at this time.  You
13   go ahead.
14
15                      *    *    *
16                    EXAMINATION
17   BY MR. MILLER:
18         Q.    Mr. Payne, the -- when we're
19   talking about the actively resisting subject,
20   and you were asked about the number of different
21   tools that they had available to them, whether
22   they had them or not.
23               Even if they did have other tools
24   available, is the decision to use an ASP, such
25   as Sheriff Acree chose to do in this situation,
```

```
 1   does that necessarily make it a wrong or a bad
 2   decision?
 3        A.    No.  It's a -- you know, I -- group
 4   control tools and -- just what they are, control
 5   tools.  It's up to the individual officer and
 6   their particular needs, or what they think their
 7   particular needs are at the time, to make that
 8   decision.
 9        Q.    Can I ask you -- and this is just
10   because I don't know.  The hard empty hand, is
11   that like fist strikes, or hammer strikes, or
12   stuff like that with the fist?
13        A.    It could be any personal weapon
14   that I use to strike with.  So it could be a --
15   a head-butt.  It could be an elbow.  It could be
16   a punch, it could be a knee, it could be a kick.
17   So any of that.  Anything where I'm striking,
18   that's hard empty hand.
19        Q.    And to go back to -- that would
20   also be an option for someone --
21              THE WITNESS:  Did he -- I'm sorry,
22   sir.  You cut out.  I lost you after option.
23              THE COURT REPORTER:  Yeah.
24   BY MR. MILLER:
25        Q.    I'm -- can you hear me now?
```