UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:21-CV-00134-GNS-LLK

JARED THOMAS KENNEDY                                            PLAINTIFF

v.

AARON ACREE et al.                                            DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Kaminski's Motion for Summary Judgment (DN 69); Defendant Hicks' Motion for Summary Judgment (DN 76) and Motion to Exclude Sweeney (DN 78); and Defendant Acree's Motion for Summary Judgment (DN 81) and Motion to Exclude Sweeney (DN 80). The motions are ripe for adjudication.

## I.       STATEMENT OF FACTS AND CLAIMS

On September 19, 2020, at around 7:30 PM, Plaintiff Jared Thomas Kennedy ("Kennedy") drove to pick up his wife from work. (Kennedy Dep. 45:3-9, Nov. 12, 2024, DN 86-1). A Cadiz Police Department officer—Defendant Micah Kaminski ("Kaminski")—observed Kennedy speeding, so he pulled behind Kennedy and engaged his lights and sirens. (Kaminski Dep. 65:7-13, Aug. 27, 2024, DN 86-8). Allegedly, Kennedy did not hear Kaminski over his car's stereo. (Kennedy Dep. 57:4-12). Kennedy did not stop and drove through a parking lot before veering through a golf course and hitting a tree, which Kennedy says was caused by a tire blow-out. (Kennedy Dep. 58:21-59:11, 67:22-68:4). After hitting the tree, Kennedy kept driving because he could not afford to have his car towed and felt he could drive it safely back home. (Kennedy Dep. 59:12-18).

After exiting the golf course, Kennedy entered a pharmacy parking lot, where Kennedy first acknowledges seeing Kaminski.  (Kennedy Dep. 61:8-10, 62:15-23).  Kaminski drove between the two parking lot exits, attempting to corral Kennedy, but Kennedy drove through a ditch to get back to the road.  (Kaminski Dep. 68:18-69:6).  According to Kennedy, Kaminski moved away from the exit so Kennedy could leave the parking lot.  (Kennedy Dep. 62:15-23).  At that point, Trigg County Sheriff, Defendant Aaron Acree ("Acree"), and one of his deputies, Defendant Gary Hicks ("Hicks"), joined Kaminski in pursuit.  (Acree Dep. 120:2-7, Nov. 20, 2024, DN 86-2; Hicks Dep. 46:1-12, May 7, 2024, DN 86-7).

Kennedy maintains that he drove cautiously—going no faster than 35 miles per hour and using his turn signal—for the duration of the chase.  (Kennedy Dep. 76:18-21, 184:3-12).  Defendants acknowledge that Kennedy signaled his turns but otherwise dispute his characterization of the pursuit.  (Body Camera 0:14-0:21, DN 86-6).  Defendants claim that Kennedy ignored multiple stop signs, swerved in and out of lanes, and drove through several yards and ditches.  (Hicks Dep. 45:19-46:21).  Moreover, as Kennedy drove, sparks flew from his flat tire and parts fell off his car.  (Kaminski Dep. 74:25-75:3).  Hicks attempted a PIT maneuver,[1] causing Kennedy's car to stall, but Kennedy continued to flee.  (Hicks Dep. 46:22-47:7).  The chase ended in Kennedy's driveway, where he engaged his emergency brake, shifted into park, and turned the engine off.  (Kennedy Dep. 188:16-20).  The nine-mile pursuit lasted approximately 20 minutes.  (Kennedy Dep. 88:22-89:23).

---

[1] Acree described a "PIT maneuver" as "when you take the front end of your vehicle, and best you can, position it in a way at the tail end of the fleeing suspect[']s vehicle.  You accelerate and turn into their vehicle, and it should be a very smooth process to disable their vehicle.  It should cause them to spin out and be disengaged from the pursuit."  (Acree Dep. 125:17-126:4).

Hicks approached Kennedy's car and ordered him out.[2]  (Kennedy Dep. 84:1-3).  Kennedy opened his door and exited "hands first."  (Kennedy Dep. 84:3-4).  Hicks then grabbed Kennedy's hand and threw him to the ground.  (Kennedy Dep. 84:4-9).  Kennedy acknowledged that the body cam video shows Hicks telling him to get down, stop resisting, and put his hands behind his back, but he did not remember hearing these instructions at the time.  (Kennedy Dep. 100:1-11).

The body cam video reflects that Kennedy did not initially give the officers his hands as he exited his car; instead, he kept his arms underneath his body to keep his abdomen off the ground, which he says was to mitigate pain from a prior injury.  (Kennedy Dep. 98:19-99:9, 100:15-18).  (Kennedy Dep. 98:19-25).  Kennedy had no reason to believe the officers knew about that injury.  (Kennedy Dep. 99:10-15).  When Kennedy was told to stop resisting, he responded, "Nobody is resisting." (Body Camera 2:08, DN 86-3).  Kennedy alleges that he was kicked, punched, struck with a baton, and had his face ground into the pavement.  (Kennedy Dep. 104:25, 106:11-12, 107:12-15, 163:14-19, 175:18-19).

Kaminski was the only officer wearing a body camera and did not use force against Kennedy, which makes it more difficult to determine the actions of each Defendant.  (Hicks Dep. 52:14-17; Acree Dep. 52:13-17; Kaminski Dep. 108:20-22).  Acree maintains that his only use of force was two or three baton strikes, as seen on video.  Body camera footage shows Acree making a stomping motion, though it is unclear whether his leg contacted Kennedy's body.  (Acree Dep. 229:7-15; Body Camera 1:57, 2:01, 03-05, DN 86-3). Additionally, Hicks can be seen grabbing Kennedy's hair and delivering two punches to his side while Kennedy was on the ground.  (Body

---

[2] As Kennedy now points out, this command is not audible in the body camera video.  (Pl.'s Resp. Defs.' Mots. Summ. J. 5; Body Camera 1:50-57, DN 86-3).

Camera 2:15-2:24, DN 86-3). Kennedy also alleges that Hicks kicked him, though this is also not clear from the body camera video. (Body Camera 1:59-2:00, DN 86-3).

When Hicks and Kaminski moved Kennedy's arms behind his back for cuffing, Kennedy can be heard to yell, "Ow, my arm won't bend that way!" (Body Camera 2:39-2:41, DN 86-3). As Kennedy's handcuffs were tightened, Hicks told Kennedy to stop pulling but Kennedy responded that he was not pulling. (Body Camera 2:47-50, DN 86-3). Kennedy also called for Hicks to stop touching his hair. (Body Camera 3:23-6, DN 86-3). Around two minutes elapsed between the time Kennedy was pulled from his car and when he was placed in the police car. (Body Camera 1:56-4:02, DN 86-3). The officers did not use any additional force after Kennedy was handcuffed, though vulgarities were exchanged. (Kennedy 165:24-166:2; Body Camera 3:25-40, DN 86-3).

Kennedy was charged with failure to maintain required insurance, failure to wear seat belt, failure to maintain registration plates, speeding, disregarding a stop sign, fleeing or evading the police, resisting arrest, criminal mischief, and wanton endangerment. (Uniform Citations, DN 76-2). Kennedy initially plead guilty to failure to maintain required insurance, criminal mischief, wanton endangerment, and fleeing or evading the police, but his plea was later amended to replace fleeing or evading the police with first degree wanton endangerment. (Final J. & Sentence, Ex. 76-3; Am. Final J. & Sentence, DN 76-4).

Kennedy now brings claims against Acree and Hicks for excessive force, battery, assault, and intentional infliction of emotional distress ("IIED"). (3d Am. Compl., DN 27). Kennedy also brings claims against Kaminski for failure to intervene and IIED. (3d Am. Compl.).

## II.     JURISDICTION

The Court has jurisdiction over this matter based upon federal question jurisdiction.  *See* 28 U.S.C. § 1331.  The Court also has supplemental jurisdiction over the pendent state-law claims. *See* 28 U.S.C. § 1367.

## III.     DISCUSSION

### A.     Motions to Exclude Plaintiff's Expert

The Sixth Circuit "permit[s] experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004) (citations omitted).  Because of the nature and subject of an expert witness's testimony, there is an important difference between proper police practice opinions which assist the trier of fact and improper legal conclusions that do not. *See Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994).  A police practices expert may testify about specific police practice standards and whether, if the jury believes that an officer committed certain actions, those actions met or violated that standard.  *See Champion*, 380 F.3d at 908; *Gough v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:12-CV-849-DJH-CHL, 2016 WL 4535663, at *2 (W.D. Ky. Aug. 30, 2016); *Harrison v. Ellison*, No. 3:21-CV-174-RGJ, 2023 WL 4141050, at *7 (W.D. Ky. June 22, 2023).  Permissible subjects of testimony include "the continuum of force employed by officers generally, the specific training the Officers received, and [the expert's] opinion that if the witnesses' testimony is credited, the Officers' actions violated nationally recognized police standards governing excessive force." *Champion*, 380 F.3d at 908. A police practices expert may not, however, testify to legal conclusions or define legal terms. *Berry*, 25 F.3d at 1353-54.  "It is well settled that a police practices expert may not opine to a jury that an officer's conduct was 'illegal,' 'unlawful,' 'not justified under the circumstances,' 'not

warranted under the circumstances,' a violation of a citizen's rights, or 'totally improper.'" *Knopek v. City of Warren*, No. 23-13028, 2025 WL 1466785, at *14 (E.D. Mich. Mar. 19, 2025) (quoting *Berry*, 25 F.3d at 1354).

Defendants request that the Court exclude Kennedy's expert witness, David T. Sweeney ("Sweeney"), because he offers improper legal conclusions rather than testifying about any specific police practice standard.  (Hicks' Mot. Exclude Sweeney 1; Acree's Mot. Exclude Sweeney 4).  In his expert disclosure, Kennedy indicated that Sweeney "would "testify regarding whether Defendants Acree, Hicks, and Kaminski acted reasonably during the arrest of Plaintiff, including whether one, some, or all of the Defendants used unnecessary or excessive force against Plaintiff, resulting in injury to the Plaintiff."  (Pl.'s Expert Disclosure 1, DN 54).  Although Sweeney attempts to frame this legal analysis as a policing standard by asserting that "police training . . . will include instruction in case law and constitutional principles and how they relate to the use of force," Sweeney clearly offers improper legal conclusions.  (Sweeney Report 10, DN 54-1).  An expert may not use legal standards to determine that the force used was excessive, as this would invade the province of the judge and jury.  *Henry v. City of Flint*, No. 17-CV-11061, 2019 WL 2207669, at *7 (E.D. Mich. Apr. 19, 2019), *report and recommendation adopted*, No. 17-CV-11061, 2019 WL 2211847 (E.D. Mich. May 21, 2019); *Alvarado v. Oakland Cnty.*, 809 F. Supp. 2d 680, 691 (E.D. Mich. 2011).  The first four subsections of Sweeney's analysis, however, explain and apply the factors articulated in *Graham v. Connor*, 490 U.S. 386 (1989), to this case, concluding that Acree and Hicks used excessive force.  (Sweeney Report 10-11, 18, 31).  Sweeney's legal conclusions are not admissible.

Kennedy asserts that Sweeney's legal conclusions create genuine disputes of material fact, but this is not so.  (Pl.'s Resp. Defs.' Mots. Summ. J. 15, 16).  "[T]he Court is under no obligation

to accept the legal conclusions offered by [a non-moving party's] experts in determining whether a genuine dispute of material fact exists." *Zuress v. City of Newark*, No. 2:17-CV-866, 2019 WL 4697026, at *8 (S.D. Ohio Sept. 26, 2019) (citation omitted); *Brainard v. American Skandia Life Assur. Corp.,* 432 F.3d 655, 663 (6th Cir.2005) ("An expert opinion submitted in the context of a summary judgment motion 'must be more that a conclusory assertion about ultimate legal issues.'" (citation omitted)). While Defendants also challenge other opinions contained Sweeney's report— that it was unprofessional for Acree not to wear a body camera or document his use of force, for example—Kennedy does not rely on these opinions to oppose Defendants' motions for summary judgment. Because summary judgment is granted, as discussed below, Defendants' motions to exclude are moot as to these opinions.

## B.    Motions for Summary Judgment

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of stating the basis for the motion and identifying the evidence demonstrating an absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party satisfies its burden, the nonmoving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable for the nonmoving party, the nonmoving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the nonmoving party must present facts proving that a

genuine factual dispute exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

Video footage from law enforcement officers' body cameras can be determinative to the Court's review. If the video shows facts so clearly that a reasonable jury would be able to view these facts in only one way, the Court should view the facts as depicted by the video. *Scott v. Harris*, 550 U.S. 372, 380 (2007). When the facts shown in the body camera video can be interpreted in multiple ways or if the video does not reveal the salient facts, the facts must be viewed in the light most favorable to the nonmoving party. *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015). Where the video footage has "gaps or uncertainties," reasonable inferences from the video must be construed in the light most favorable to the nonmoving party. *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022).

All three Defendants move for summary judgment. (Def.'s Mot. Summ. J., DN 69 [hereinafter Kaminski's Mot. Summ. J.]; Def.'s Mot. Summ. J., DN 76 [hereinafter Hicks' Mot. Summ. J.]; Def.'s Mot. Summ. J., DN 81 [Acree's Mot. Summ. J.]). Kennedy has indicated that he wishes to voluntarily dismiss all claims against Kaminski, which is a concession that Kaminski is entitled to summary judgment as a matter of law. (Pl.'s Resp. Defs.' Mots. Summ. J. 1). The Court now turns to Kennedy's federal and state law claims against Acree and Hicks.

### 1.    *Federal Law*

Kennedy brings a Section 1983 claim against Defendants, claiming that they violated his Fourth Amendment right to be free from unreasonable seizures. (3d Am. Compl. ¶¶ 61-63).

a.    ***Heck* Doctrine**

Hicks argues that the *Heck* doctrine bars Kennedy's excessive force claims. (Hicks' Mot. Summ. J. 10). In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court recognized a doctrine that "generally prohibits the use of actions under 42 U.S.C. § 1983 as an avenue to launch a collateral attack upon a criminal conviction." *Embassy Realty Invs., LLC v. City of Cleveland*, 877 F. Supp. 2d 564, 574 (N.D. Ohio 2012) (citing *Heck*, 512 U.S. at 486). The Sixth Circuit has summarized this doctrine as follows:

> Claims which challenge the validity of a state conviction or sentence are not cognizable under [Section] 1983 in the absence of a demonstration that the criminal conviction or sentence in state court "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."

*Wheat v. Ohio*, 23 F. App'x 441, 443 (6th Cir. 2001) (quoting *Heck*, 512 U.S. at 486-87). The key inquiry in determining the applicability of this doctrine is whether "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* (quoting *Heck*, 512 U.S. at 487).

Kennedy pleaded guilty to first-degree wanton endangerment. (Final J. & Sentence 1-2; Am. Final J. & Sentence 1). "[A]ccording to the Kentucky Supreme Court, '[o]ne cannot be guilty of first-degree wanton endangerment if his conduct does not, in part, create a substantial danger of death or serious physical injury to another person.'" *Thompson v. Jenkins*, No. 4:22-CV-P57-JHM, 2024 WL 4545988, at *2 (W.D. Ky. Oct. 22, 2024) (quoting *Johnson v. Commonwealth*, 680 S.W.3d 814, 822 (Ky. 2023)). This Court has held that "by pleading guilty to first-degree wanton endangerment of police officers, [a plaintiff] has admitted to conduct for which the officers were entitled to protect themselves, including the use of deadly force . . . ." *Id.*; *see also Hart by*

& *through Dillon v. Lawson*, No. 6:20-CV-147, 2024 WL 251147, at *10 (E.D. Ky. Jan. 23, 2024); *Phillips v. Curtis*, 765 F. App'x 130, 132 (6th Cir. 2019) ("For placing [an officer] in substantial danger of serious death or injury would mean that, at that moment, [the officer] could use deadly force." (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985))).

A guilty plea, however, does not automatically preclude an excessive force claim.  *See Phillips*, 765 F. App'x at 132.  "The Sixth Circuit [] has expressly limited the applicability of *Heck* based on the timing of the alleged excessive force."  *Shelton v. Greer*, No. 1:20-CV-00046-GNS, 2022 WL 3439390, at *2 (W.D. Ky. Aug. 16, 2022) (quoting *Michaels v. City of Vermillion*, 539 F. Supp. 2d 975, 992 (N.D. Ohio 2008)).  For example, when a plaintiff alleges excessive force is used after the arrest occurred, "the civil suit and the conviction potentially deal with separate moments and potentially can coexist without contradicting one another."  *Phillips*, 765 F. App'x at 132.  In *Phillips*, the Sixth Circuit stated:

> Phillips purports to identify two separate incidents, one when she endangered Curtis, the other when he opened fire.  To be sure, if the two incidents happened at roughly the same time—or in legitimate response to one another—*Heck* would bar her lawsuit.  For placing Curtis in substantial danger of serious death or injury would mean that, at that moment, Curtis could use deadly force.  But Phillips says that she placed Curtis's life in jeopardy at point one, she ceased to be a threat at point two, and only after that did Curtis shoot her.  Under that scenario, assuming a material gap in time between the two events, her victory in this lawsuit would not necessarily invalidate her criminal conviction.

*Id.* at 132 (internal citation omitted).  Accordingly, "conduct directly responsive to wanton endangerment would be subsumed within *Heck*, but a distinct force event would not."  *Hart by & through Dillon*, 2024 WL 251147, at *11 (citation omitted).

In this instance, the record indicates that the factual basis for Kennedy's conviction for first-degree wanton endangerment consists of his flight from police.  That Kennedy's driving endangered others *and* that the officers used excessive force after he was removed from his car are

certainly not mutually exclusive.  Because Kennedy alleges the excessive force occurred after he parked, a verdict finding excessive force would not necessarily undermine his conviction for wanton endangerment.  At the very least, "[c]onsidering this timing, the Court finds that there exists a disputed issue of material fact as to whether the events were conceptually distinct, and whether a successful excessive force claim 'would necessarily imply the invalidity of [his] conviction.'"  *Curran v. Aleshire*, 67 F. Supp. 3d 741, 749 (E.D. La. 2014) (quoting *Hudson v. Hughes*, 98 F.3d 868, 872 (5th Cir. 1996)).  Summary judgment on this basis is therefore denied.

### b.    Qualified Immunity

Under federal law, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citing *Procunier v. Navarette*, 434 U.S. 555, 565 (1978); *Wood v. Strickland*, 420 U.S. 308, 322 (1975)).  "The burden rests on Plaintiff to show Defendants are not entitled to immunity."  *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012) (citation omitted).

To determine whether a defendant is entitled to qualified immunity, a court must consider: (i) whether "based on applicable law and the facts viewed in the light most favorable to the plaintiff, has a constitutional violation occurred"; and (ii) if so, whether "the constitutional right [was] 'clearly established' at the time of violation." *Penman v. Correct Care Sols.*, No. 5:18-CV-58-TBR, 2018 WL 6220921, at *8 (W.D. Ky. Nov. 28, 2018) (citing *Bell v. Johnson*, 308 F.3d 594, 601 (6th Cir. 2002); *Saucier v. Katz*, 533 U.S. 194 (2001)).

### i.      Constitutional Violation

Kennedy alleges that Acree and Hicks used excessive force.  In considering excessive force claims, courts "must ask whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Reed v. Campbell Cnty.*, 80 F.4th 734, 748 (6th Cir. 2023) (internal quotation marks omitted) (citation omitted).  Courts are guided by the following three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8-9).  "These factors help inform our ultimate inquiry, which must always be 'whether the totality of the circumstances' justified the use of force."[3] *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Livermore ex rel. Rohm v. Lubelan,* 476 F.3d 397, 404 (6th Cir. 2007)).

First, leading law enforcement in a car chase is a serious crime, even if the attempted traffic stop arose from a simple traffic violation.  *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) ("Evading a police officer cannot be dismissed as a minor traffic violation . . . .").  It is undisputed that, although Kaminski only initiated the stop because Kennedy was speeding, Kennedy fled from the officers.  Kennedy's evasion, however, cannot be fairly described as a high-speed chase— Kennedy avers he was driving no faster than 35 miles per hour.  Additionally, Kennedy used turn

---

[3] As the Supreme Court recently held:

> [T]he "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review.  But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones.

*Barnes v. Felix*, 605 U.S. 73, 80 (2025).

signals, which is atypical behavior for someone fleeing the police. Though Kennedy did not attempt to shake the officers and observed traffic regulations, he continued to drive despite knowing law enforcement officers were pursuing him. Moreover, he continued to drive even after he hit a tree and Hicks attempted to execute a PIT maneuver. Car chases involving collisions with other vehicles are especially dangerous. *See Blosser v. Gilbert*, 422 F. App'x 453, 458 (6th Cir. 2011).

Kennedy's conduct while fleeing the police supported his conviction for first-degree wanton endangerment. Indeed, by pleading guilty, Kennedy acknowledged that, "under circumstances manifesting extreme indifference to the value of human life, he [] wantonly engage[d] in conduct which create[d] a substantial danger of death or serious physical injury to another person." KRS 508.060. First-degree wanton endangerment is a Class D felony, and a crime of violence for the purposes of career offender designations. *United States v. Meeks*, 664 F.3d 1067, 1071 (6th Cir. 2012). Accordingly, his crime was severe.

Second, it is generally reasonable to believe that someone who flees from police poses a threat to the officers. *Dunn*, 549 F.3d at 354. When a plaintiff attempts to evade police, this "suggest[s] that he may have had something to hide . . . ." *Id.* "[A] reasonable officer would have expected the vehicle's occupants to be fleeing from police for a reason. The vehicle's dangerous maneuvering would lead a reasonable officer to believe the vehicle's occupants were just as dangerous." *Hurd v. Adams*, No. 7:20-CV-00047-EBA, 2023 WL 4306667, at *10 (E.D. Ky. June 30, 2023). To Kennedy's credit, under his version of the facts, he was not driving recklessly. Thus, Kennedy should have appeared less dangerous than fleeing suspects in other cases—he did not use his car as a weapon, for example. Still, "[i]t would have been reasonable for the Officers to be apprehensive that [the plaintiff] may have a weapon in the car . . . ." *Dunn*, 549 F.3d at 354.

Moreover, Kennedy led the officers to a rural location unfamiliar to them.  Because his car did not have a state-issued license plate, the officers could not obtain any information about him—they did not know his name, much less whether he had any outstanding warrants or criminal history. (Kennedy Dep. 47:18-48:21).  It was therefore reasonable for the officers to be apprehensive that Kennedy may have been dangerous.

If a person "pose[s] no safety risk to the police[,]" however, they may not be subjected to "gratuitous violence during arrest." *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006).  This is most obvious when a plaintiff is handcuffed but also applies when a plaintiff is otherwise neutralized, such as being incapacitated by pepper spray or being "completely pinned" by an officer.  *See id.* at 687; *Roberts v. Manigold*, 240 F. App'x 675, 676 (6th Cir. 2007).  For example, the officer in *Roberts*, a 225-pound former college running back, had already tackled the plaintiff when the second officer used her taser, even though the first officer "admit[ted] that he would have been able to subdue [the plaintiff] without [the second officer's] assistance." *Roberts*, 240 F. App'x at 676.

In this instance, Kennedy was not neutralized when the officers used force.  The body cam footage clearly shows that his arms and hands were still free—he had not yet been handcuffed. Kennedy kept his hands beneath his him, pushing his upper body up off the ground.  (Kennedy Dep. Video 12:48-49 PM, Nov. 12, 2024, DN 86-27).  Moreover, the officers did not yet have Kennedy pinned down when Kennedy was kicked and struck by a baton.  (Body Camera 1:50-2:08, DN 86-3).  After he was pinned, Hicks punched Kennedy to secure his hands.  Once Kennedy's hands were secured, no additional force was used.

As to the third factor, Kennedy's flight from police weighs against him once again.  *Dunn*, 549 F.3d at 354 ("As to Dunn's level of resistance, it is undisputed that he resisted by failing to

stop for Officer Matatall's signals for approximately two minutes.).  He led police on a chase that lasted around twenty minutes, and continued to flee even after Hicks conducted a PIT maneuver. Kennedy's resistance—or lack thereof—after he stopped his car, however, must also be considered.

A plaintiff's failure to produce his hands for handcuffing may be reasonably interpreted as resistance, depending on the circumstances.  *See Rudlaff v. Gillispie*, 791 F.3d 638, 641-42 (6th Cir. 2015).  According to the Sixth Circuit, "[a]ctive resistance includes physically struggling with, threatening, or disobeying officers.  And it includes refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance . . . ."  *Id.* (internal quotation marks omitted) (internal citation omitted) (citations omitted).  A plaintiff who refuses to place his hands behind his back—even for medical reasons—is still resisting arrest.  *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007).  Physical disabilities may present a mitigating circumstance, however, and rough treatment may still be excessive.  *Id.*  As discussed in *Marvin*:

> With regard to whether the suspect was resisting arrest, it is undisputed that when given a command by Officer Minard to place his hands behind his back, Marvin refused to do so.  To Marvin's credit, he asserts that he told the officer that he was physically unable to place his arms behind his back because it was painful to do so. After again being instructed to put his arms behind him, Marvin again said he could not do so, at which point Officer Minard exerted the force at issue here.  While Marvin's alleged physical disability weighs against Officer Minard's actions, the fact remains that Marvin was resisting arrest.  Arguably, Marvin's method of resisting could be characterized as passive such that the resistance was not so great as to require Officer Minard's allegedly rough treatment.

*Id.* (citation omitted).  Alternatively, if an individual is attempting to comply but the police officers themselves are preventing him from presenting his hands, "it would not have been reasonable for an officer on the scene to have perceived the struggle as . . . 'active resistance' . . . ."  *Stanfield v. City of Lima*, 727 F. App'x 841, 848 (6th Cir. 2018).

In this instance, Kennedy did not tell the officers, and the officers had no reason to know, that he was placing his arms underneath his body to mitigate pain from a prior injury. While Kennedy did say "my arm won't bend that way" in response to Kaminski moving his arm behind his back for cuffing, this was after the other officers' alleged use of excessive force, and Kennedy does not argue that Kaminski violated his rights. Unlike *Stanfield*, the officers themselves were not preventing Kennedy from complying.[4] Though Kennedy argues that the officers did not give him a chance to comply, our sister court has remarked that, following a car chase, "a reasonable officer . . . would have perceived the vehicle's occupants to be dangerous, such that swiftly securing the occupants was a priority." *Hurd*, 2023 WL 4306667, at *12.

Additionally, Kennedy's protests that "nobody is resisting" has little weight. As the Sixth Circuit held in *Dunn*:

> Although Dunn's statement, "I'm coming, I'm coming," may indicate that he had decided to exit the vehicle on his own, only seconds elapsed between the time the seatbelt was unfastened and when Dunn was pulled out of the car, giving the Officers little opportunity to fully comprehend whether Dunn had finally decided to become compliant. It was reasonable for the Officers still to consider Dunn resistant. As Sergeant Porter stated, "at what point do we then trust this resistant person to suddenly say, okay, I give up."

---

[4] Kennedy asserts that Hicks "admitted . . . that Kennedy's body position made it physically impossible to comply fully with commands to place his hands behind his back." (Pl.'s Resp. Defs.' Mots. Summ. J. 5). Kennedy cites the following portion of Hicks' deposition to support that assertion:

> Q. Mr. Kennedy never struck you.
> A. That's correct. I didn't allow him to.
> Q. And did it seem as if he was trying to?
> A. I didn't want to let him get up to his feet. I didn't know what his actions were going to be if he was able to get back up on his feet.

(Hicks Dep. 119:17-25). Nowhere did Hicks state that he prevented Kennedy from surrendering his hands, nor is that a fair implication from his testimony. Kennedy did not testify that the officers prevented him from complying.

*Dunn*, 549 F.3d at 354-55. Moreover, although Kennedy **said** he was not resisting, he still did not produce his hands. Thus, it was reasonable for the officers to construe Kennedy's refusal to produce his hands as resistance.

An individual's refusal to produce their hands does not give officers a pass to use excessive force. *Shreve*, 453 F.3d at 686 ("Policemen may not strike an arrestee lying on the ground with a stick for about fifteen minutes, nor may they 'jump' up and down on her back repeatedly with a knee—not even if she refuses to produce her hands for cuffing."). Here, force was applied for less than one minute and the officers did not hit Kennedy in a "sensitive part" of his body. *Ellis v. City of Providence*, No. 4:17-CV-00042-GNS, 2023 WL 4919683, at *8 (W.D. Ky. Aug. 1, 2023). Hicks punched Kennedy in the side, and the Sixth Circuit has held under similar circumstances that hand strikes are reasonable. *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010) (holding "two closed-fist blows to Williams' middle back" was not excessive). Though Hicks gripped Kennedy's hair and appears to have pushed his face into the ground, this is not as dangerous as a "blow" to the head. *Ellis*, 2023 WL 4919683, at *8. Additionally, Hicks and Acree appear to kick Kennedy in his lower body, if they kick him at all. Acree also struck Kennedy with a baton. The Sixth Circuit generally treats batons as non-lethal weapons, but a baton strike could be considered deadly force if aimed at a person's head. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 401 (6th Cir. 2022) (citing *Davis v. Agosto*, 89 F. App'x 523, 526 (6th Cir. 2004)). When a suspect resists arrest, a "fifty-nine-second period of strikes and jabs" using a baton was reasonable because the officers "directed all jabs and strikes to non-critical areas of [the plaintiff's] body, such as the arms, torso, back, and legs. They did not hit his head, throat, neck, heart, or groin." *Jones v. City of Cincinnati*, 736 F.3d 688, 695 (6th Cir. 2012). Similarly, Acree directed all force to Kennedy's lower body.

Considering the totality of the circumstances, the officers in this instance did not violate Kennedy's right to be free from excessive force. The officers acted quickly to secure Kennedy and did not use force after he was cuffed. That force was not excessive considering the "heightened suspicion and danger brought about by the car chase." *Dunn*, 549 F.3d at 355. As the Supreme Court indicated in *Graham*, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (internal citation omitted). Accordingly, the record does not support Kennedy's claim of excessive force.

### ii.    Clearly Established

Even if Kennedy had demonstrated that the Defendants violated his rights, Kennedy has not met his burden to prove that his rights were clearly established. "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (internal quotation marks omitted) (internal citation omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "The critical question is whether the case law has put the officer on notice that his conduct is clearly unlawful." *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005), *abrogated on other grounds as recognized by Marvin*, 509 F.3d at 246 n.6.

"[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal

doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (alteration in original) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).  As the Supreme Court has noted, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* (quoting *Mullenix*, 577 U.S. at 13).

The cases cited by Kennedy fail to satisfy this heavy burden.  *See Baker v. City of Hamilton*, 471 F.3d 601 (6th Cir. 2006); *Shreve*, 453 F.3d 681; *McDowell v. Rogers*, 863 F.2d 1302 (6th Cir. 1988).  Certainly, the "use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker*, 471 F.3d at 607-08.  Kennedy, however, was not neutralized and refused to produce his hands. Accordingly, *Shreve* and *McDowell* are inapposite because the plaintiffs there were already incapacitated by pepper spray or handcuffed when subjected to force. *Shreve*, 453 F.3d at 687; *McDowell*, 863 F.2d at 1307.  *Baker* is also distinguishable because, while the plaintiff was not incapacitated, he had raised his hands in surrender.  *Baker*, 471 F.3d at 604. Further, none of these cases involve fleeing the police in a vehicle; the plaintiffs in *Baker* and *McDowell* fled on foot, not in a car, and the plaintiff in *Shreve* did not flee at all but hid from police in a closet. *Baker*, 471 F.3d at 604; *McDowell*, 863 F.2d at 1303; *Shreve*, 453 F.3d at 688.  Courts have repeatedly emphasized the heightened suspicion and danger that results from a car chase. *See, e.g.*, *Dunn*, 549 F.3d at 355.

Indeed, the most similar case to facts at bar is *Williams*.  After pulling the plaintiff out of the car following a high-speed chase:

> Williams continued to struggle to hold his hands under his body and would not show them to the officers, who still did not know whether Williams had a weapon. Officer Didyk delivered two closed-fist blows to Williams' middle back.  Only when this failed to subdue Williams did Officer Didyk use his taser.

*Williams*, 373 F. App'x at 548.  The court held that this was a reasonable use of force because it "was brief and was used only to bring a non-compliant Williams under control."  *Id.*

Kennedy has not shown that the officers violated a clearly established right.  Thus, qualified immunity applies, and Defendants are entitled to summary judgment.  "Qualified immunity is a defense only to individual capacity claims[,]" however, so the Court now turns to Kennedy's official capacity claims.  *Meogrossi v. Aubrey*, No. 3:09CV-00301-JDM, 2011 WL 1235063, at *6 (W.D. Ky. Mar. 31, 2011).

### c.    Official Capacity

"Official-capacity suits . . . 'generally represent [] another way of pleading an action against an entity of which an officer is an agent.'"  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 n.55 (1978)).  Thus, Kennedy's claims against Hicks and Acree are actually against Trigg County.  When a Section 1983 claim is made against a county, this Court must analyze two distinct issues:  (1) whether Plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the county is responsible for that violation.  *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).  Even assuming a constitutional violation occurred, "a plaintiff may only hold a [county] liable under [Section] 1983 for the entity's own wrongdoing."  *Buehner v. City of Cleveland*, 788 F. Supp. 3d 827, 879 (N.D. Ohio 2025) (citing *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)).  Accordingly, a plaintiff must demonstrate that the violation was caused by an official county policy, which "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted).

Acree argues that Kennedy has abandoned his official capacity claims.  "This Court's jurisprudence on abandonment of claims is clear:  a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citations omitted)).  Kennedy does not address Defendants' arguments that the federal official capacity claims should be dismissed. Indeed, Kennedy only references official capacity claims in the context of *state* law.  (Pl.'s Resp. Defs.' Mots. Summ. J. 20).  Kennedy does mention that Acree has pattern of misconduct—a consideration in some *Monell* claims—but explicitly connects that pattern to his argument about qualified immunity, rather than the county's liability.  (Pl.'s Resp. Defs.' Mots. Summ. J. 20).

To hold a county liable, "*Monell* requires that a plaintiff identify the policy, connect the policy to the c[ounty] itself and show that the particular injury was incurred because of the execution of that policy." *Fair v. Franklin Cnty.*, 215 F.3d 1325, 2000 WL 659418, at *3 (6th Cir. 2000) (citation omitted).  Kennedy has not done so.  Defendants, in their official capacities, are therefore also entitled to summary judgment on Kennedy's excessive force claim.

## 2.    *State Law*

Kennedy brings state law assault, battery, and IIED claims against Defendants in their individual and official capacities. Because Defendants' use of force was objectively reasonable, Kennedy's state law claims fail, and Defendants are entitled to summary judgment.

First, regarding the assault and battery claims, "[p]olice officers generally have a privilege to use reasonably necessary force to preserve order." *Woosley v. City of Paris*, 591 F. Supp. 2d 913, 923 (E.D. Ky. 2008) (citing *Lawson v. Burnett*, 471 S.W.2d 726, 728-29 (Ky. 1971)), *as amended* (Dec. 4, 2008).  Because Defendants' use of force was objectively reasonable, as established above, Kennedy's assault and battery claims fail. *Atwell v. Hart Cnty.*, 122 F. App'x

215, 219 (6th Cir. 2005) ("Having concluded that the actions . . . that are the basis of [the appellant's] assault and battery claim were objectively reasonable in the [Section] 1983 context, we further conclude that [the appellant] could not prove his claim under Kentucky law.")

Next, "[t]he conduct alleged in a Kentucky IIED claim must clear a 'high threshold' of outrageousness." *K.K. by & through J.K. v. Clark Cnty. Bd. of Educ.*, 439 F. Supp. 3d 905, 920 (E.D. Ky. 2020) (quoting *Lattanzio v. Brunacini*, No. 5:16-171-DCR, 2018 WL 3421825, at *5 (E.D. Ky. Jul. 13, 2018)). Courts refer to the Restatement (Second) of Torts for guidance on whether this threshold is met. *K.K. by & through J.K.*, 439 F. Supp. 3d at 920-21. The Restatement provides that:

> It [is not] enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts § 46, cmt. d (1965). As discussed above, the officers used reasonable force to subdue Kennedy. Their conduct was not "outrageous" as required to support a claim for IIED.

Finally, Defendants argue that Kennedy has abandoned his official capacity claims by failing to address their sovereign immunity arguments. There is only one mention of sovereign immunity in Kennedy's response. (Pl.'s Resp. Defs.' Mots. Summ. J. 20). Kennedy has therefore abandoned this claim, and Defendants are entitled to summary judgment on all state law claims.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.     Defendant Hicks' Motion to Exclude Sweeney (DN 78) and Defendant Acree's Motion Exclude Sweeney (DN 80) are **GRANTED IN PART** and **DENIED AS MOOT IN PART**.

2.     Defendant Kaminski's Motion for Summary Judgment (DN 69), Defendant Hicks' Motion for Summary Judgment (DN 76), and Defendant Acree's Motion for Summary Judgment (DN 81) are **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE**.  The Clerk shall strike this matter from the active docket.

**Greg N. Stivers, Judge**
**United States District Court**
December 9, 2025

cc:     counsel of record